Good afternoon, everyone. And we'll call, we usually say we'll call the first case on our agenda, but today the first case is the only case on our agenda. It's a little crowded courtroom. You'd think we had more cases here. But with that, we'll call the case of the Federal Trade Commission and the Commonwealth of Pennsylvania v. Penn State Hershey Medical Center Clinical Health System, Mr. Efron. Thank you. William Efron, Counsel for Co-Appellant, Federal Trade Commission. I'm also here with my colleague, Tracy Wirtz, Co-Appellant from the State of Pennsylvania. While I'll be speaking on all issues for 30 minutes, if your honors do have any questions for the State, Ms. Wirtz is here and available. And I'd like to reserve 10 minutes for rebuttal, if that's okay. That request will be granted. Thank you, Your Honor. May it please the Court. In rejecting the Harrisburg market as a valid geographic market, the District Court committed three fundamental errors. First, it ignored the role of the relevant buyer here, the direct buyer, insurers. Second, it failed to ask whether a combined entity owning all hospitals in the Harrisburg area could increase prices post-merger at pinnacle. Third, the District Court improperly relied on defendants' temporary rate protection agreements with two large insurers in defining the geographic market. Counsel, can we start with the standard review here? Because you've asked us to look at this as a question of law, but here the District Court, it referenced the hypothetical monopolist test. It purported to apply that test, and you seem to be taking issue with its application. Isn't that, as we've said in Gordon and other cases, a question of fact rather than law? Your Honor, I think that the formulation and application of the legal test is subject to plenary review. We understand that those cases say that the ultimate conclusion is subject to clearly erroneous standard, and we also believe that the judge clearly erred in his ultimate finding. However, both in Allen-Milan v. IBM in this circuit, it talks about the formulation and application of legal principles, including analytical flaws being subject to plenary review. We've also cited a Sixth Circuit case, which talks about the formulation and application of market definition tests also being subject to plenary review. Is that because you think the District Court was misapplying the economic theory? In other words, are you asking us to hold that whenever there appears to be a misunderstanding or misapplication of an economic theory that informs the definition of the relevant geographic area, that that is a question of law? I think it's not only a misunderstanding of the economics which govern here, but I also think it's a misapplication of basic case law. I mean, even if we look to the buyer-focused inquiry of this court just in determining a geographic market, the judge fundamentally looked at the market from the perspective of the wrong buyer. It never analyzed what insurers would do in the face of a perfect case. What if we find that our standard review is strictly clearly erroneous? Can you still prevail under that standard? Absolutely, Your Honor. So it doesn't really make that much of a difference which standard we have to review this if we agree with your position. If you ultimately agree with us, then it wouldn't matter. But, yes, we do believe that the judge also clearly erred in its ultimate finding. Because as I looked at your briefs here just a little bit ago, just to check what you were asking for, you're not asking us if we disagree with the way the District Court handled this matter to send it back to the District Court. You're asking us to enter the injunctions. That's correct. We think if the proper test is applied here, there's really only one conclusion that you could reach based on the evidence below, and that would be we met our burden. All right. So turning to the first and most fundamental error, the buyer-focused inquiry, and this circuit and others have said this is the area where the buyer can rationally look to for services. And it's important to apply the market test to the right buyer. And here there's no question that that is insurers. You need to apply the market test to them, and the court didn't do that. And geographic market must also reflect commercial reality. Is there any role for consideration of patients or patient travel in the calculus? Yes, there is a role for patients. And what patients do is they inform, insure, demand as to how much they need to include a hospital or a particular set of hospitals in their network so that it's marketable in the area that they're marketing it to. So to that extent, why isn't it relevant that 43.5% of the patients at Hershey are coming from outside? That is, perhaps the District Court didn't apply it quite the right way, and I understand their arguments about Elzinga Hogarty being imported here. But isn't that fact at least relevant because those are also constituents of the payor, and that suggests that at least for that population that local hospitals outside the four-county area would still be local and convenient. Your Honor, it's wrong to solely rely or solely focus on it without ever filtering it through the lens of hospital insurer negotiations, without looking at the way prices are actually set. The reason why that leads to mistaken inferences, both in Elzinga Hogarty and what the Court did here, is merely because some subset of one hospital in the Harrisburg area, merely because some of the patients come from out of the area, in no way controverts the fact that insurers still must meet overwhelming demand for Harrisburg area hospitals in order to have a marketable network. So the fact that those patients come from those other areas, it doesn't mean that hospitals where they come from are part of a broader geographic market like the Court ruled, and it doesn't mean that those farther hospitals actually constrain the pricing of the merging parties or more broadly the hypothetical monopolists of all Harrisburg area hospitals. It leads to very mistaken inferences when you don't filter it through the hospital insurer lens because you're not asking how prices are actually set or determined. How can we know what the impact of a price increase would be when we never ask the person who's facing the price increase directly? The Court never did that. It never analyzed it from that perspective at all. But aren't you asking us to assume an insurer that has as its members only that population within the four counties? No, notwithstanding the fact that the insurers know where these patients come and go from. I mean, they know how many people stay in the Harrisburg area. They know how many people come into the Harrisburg area, and they've unequivocally said that notwithstanding where patients come and go, they cannot market a network that excluded just Hershey and Pinnacle, let alone Harrisburg area hospitals. They understand that, but nevertheless, they still have to satisfy that overwhelming demand in that more local market, notwithstanding those other patients. Let me ask you this question. In trying to come up with the smallest market, is it possible that you could support a notion of an even smaller market than the four counties? For instance, Pinnacle and Hershey are in Dauphin and Cumberland County. Yes. Could you make an argument that that's actually the smallest relevant market? Absolutely, Your Honor, and we have made that argument. I mean, the evidence does show that our market definition is conservative here, and the reason for that is that the insurers have very clearly stated that a network that excluded just Hershey and Pinnacle, they could not successfully market that, and they would have to pay a price increase to the merged entity alone. So that's a – I mean, not only does it answer the ultimate inquiry here, but it certainly satisfies a narrower hypothetical monopolist. You could say that one of just Hershey and Pinnacle would satisfy that test. We broadened it to be conservative, but absolutely. There's evidence of perhaps a price increase and certainly concern about a price increase, but for Smith, if we're looking at a 5% figure, can you point us to what is the best evidence of that? Because as your colleague from the other side of the aisle pointed out, there are some places where things are arguably overstated in the record, at least as to the 25% figure that appears in the brief. Yes. So, I mean, all of this is driven, first of all, by what the insurers are saying, is they could not market a network without Hershey and Pinnacle. They would have an unmarketable network. So let's just think of the consequences of that. I mean, while defendants are quibbling on the margins with what was said about the 25% price increase five years from now, there's no dispute that when one of the large insurers was asked, well, what would you do, what would happen with that Hershey and Pinnacle, he said, well, we wouldn't have a network at all, and we'd have but no choice to pay a price increase to the merged entity. The other large insurer in the market actually calculated, was specifically concerned about Pinnacle's prices being raised to Hershey's and calculated that potential impact, and he didn't just calculate and say, well, this is what would happen, you know, in some abstract universe. He was specifically concerned that as a result of the increased bargaining leverage that the combined entity would have, it would not be able to market. He said to the parties he wouldn't be able to negotiate appropriate market pricing in terms. So this is really strong evidence that you'd have to pay well more than 5% here in terms of but at least a small price increase because think about the consequences here if you don't, based on their testimony. Mr. Efron, it seems to me that the key here to your case is you need to be able to establish and show to us that you've met your burden, that the four-county area is the geographic market, okay? How do you reach that burden, and how have you accomplished that? On the record, it was before the district court, and on the record, it's before us. We need to show that an insurer would pay a small price increase rather than market a network without any Harrisburg area hospitals, and that's really the ultimate question, and stated another way, we have to show that the hospitals outside this area, this Harrisburg area, are not practical alternatives for the insurer when it's marketing a network to Harrisburg area employers and employees, and we have clearly done that on the record. What factor does the competition among health plans have? Let's say that you're able to show and you have testimony from payers A, and there's a lot of evidence from payers A and payers B as you refer to them, and they conclude after a merger that they're just not going to pay what the hospital wants, and they're not going to put them in their network. But along come payers C, payers D, specifically the Geisinger Health Plan or Aetna, and they come in to the four-county area and say, you know what? We've been trying to get a foothold into this market for a long time. If A and B don't want in, we'll come in and we'll pay the price. What does that do to the question of whether or not you've established the geographic market? Your Honor, they don't have that choice. They can't not market. They can't exclude the combined entity. They would have a product they couldn't sell. They've specifically testified to health. So you think there's enough in the record to show that? Beyond, yes, clearly. So in other words, because they would know that payers C and D were coming in, and they couldn't allow that to happen from an economic standpoint, they would have to match. They would not have a competitive, yes, Your Honor, they would not have a competitive product in the marketplace. They couldn't sell it. And that's even proven not only have they clearly testified that they could not have a successful product in the Harrisburg area that just excluded Hershey and Pinnacle. Remember, that's not even our burden. That's narrow. I mean, this is all we have to show is you couldn't exclude all Harrisburg area hospitals. They've testified to something much more specific and powerful than that. But that's even demonstrated by the experience of one small insurer in the marketplace right now. It had Pinnacle in its network of a small, was able to have a commercially viable product. In 2014, Pinnacle terminated its agreement with that insurer. And now it doesn't have Pinnacle or Hershey. And it rapidly lost half its members. It's unmarketable. Yeah, but that's a little different than what I had asked. I had asked, doesn't competition from the payer side further complicate the question of the geographic market? I don't believe it does, Your Honor, because I think each payer is sitting at a negotiating table with this hypothetical monopolist for us to meet our burden. And, I mean, there's an enormous increase in bargaining leverage that's occurred. And they have to just decide whether they want to pay that or whether they want to have a marketable product. That's really their choice. I don't think they can think about what someone else would do. What someone else would do is they'd have a product with those hospitals in them, and they'd be able to sell their product. The person that excluded them wouldn't. What role should the notion of critical loss play in analyzing whether the district court applied the right test by looking at EH on the one hand versus HHI on the other? It should play no role, Your Honor. It is, like Elzinga-Hogarty, it is inappropriate for health care markets because it mistakenly assumes that patients face hospital prices directly and react to them, and that's simply not how prices are set in this industry. When a patient wants its hospital, it's part of a plan. All of its in-network hospitals are largely the same price. So, they don't really select hospitals based on price to begin with. And then, even assuming that Hershey and Pinnacle raise prices, the patient would not feel that specific price increase at Hershey or Pinnacle. It would still, all of its in-network hospitals would largely be the same price. So, it's a completely mistaken assumption to think that patients see and react to these increases in prices between in-network hospitals. That simply doesn't happen in this market, so it should play no role. Doesn't that simply mean we're not looking at the direct relationship of the loss of patients, but rather that it's filtered through the payor's consideration of the effect of the price increase and whether they're going to be outside then of a hospital will be outside the network? You're saying it's irrelevant, but it seems that if one could establish a relationship between price increase, the consequent behavior on the part of the payor, and then the loss of patients as a result of that, that would inform profitability, right? Well, I mean, it isn't the way that it works. It isn't the way pricing works. It doesn't filter to that level. I mean, the insurer decides, as Your Honor said, whether to pay or include a particular hospital in its network or not. But the price increase never, and this is the St. Luke's case in the Ninth Circuit, the patient wouldn't likely even feel the impact of the SNF, and that's because of the way that the prices are set. They don't feel price differences between in-network hospitals, so the notion that patients would be lost in response to a price increase to an insurer, it's simply not a valid way of looking at it. But isn't the point of critical loss that there comes a point where the payor would rather walk away? And if that happens, there's then the loss of that patient population to the hospital. Let's step back for a second. Do you agree in response to Judge Fischer's question that one of the things that the government also needs to prove is profitability, that is that the SNF would be profitable for the hypothetical monopolist to impose? I agree that that's a requirement, but I don't think we need to prove it by disproving defendant's speculative critical loss theory. I mean, the St. Luke's case looks at what would insurers likely do in the face of the SNF. We're dealing with probabilities even under this statute generally. We're not dealing with absolute certainties, and we're looking at the best and reliable evidence. And here you have the direct customer saying, we would pay this price increase. We don't then also have to show that this critical loss, which by the way defendants never even calculated. They just said, well, if they lost this number of patients, then a price increase wouldn't be profitable. There's not a stitch of paper in the record that ever shows that any hospital thinks about patient losses in connection with negotiating with insurers. There's certainly some evidence in the record that the payers have arguably testified in support of the merger not being anti-competitive. One talk was that they had employer leverage, that there was employer leverage that they could use to countermand a price increase. And the second, I know you argued it was air for Judge Jones to look at the agreements, but don't the agreements themselves have some relevance to the SNF? No, Your Honor. They have no relevance to assessing geographic market. I mean, if you're talking about, are you asking about competitive effects ultimately, or are you asking about geographic market? Competitive effects. In other words, doesn't the fact that the hospitals under the combined cover of the merger agreement agree to enter into these five-year agreements, doesn't that indicate that perhaps a SNF analysis of the hypothetical monopolist cannot be met here?  It assumes away the question, Your Honor. The whole point is to establish what alternatives the insurer would have in the face of a hypothetical price increase. That's how we determine whether hospitals outside the market are actually practical alternatives or not. There's no relevance at all. Is there any case out there that says that, that says what you're saying? Yes, this circuit has ruled in Queen City Pizza versus Domino's explicitly that private rate agreements have no proper place in market definition, and this is certainly the case here. It assumes away the entire inquiry when you do that. What about the question I asked about the leverage, the employer leverage? Yeah, I think you're talking about a statement that the defendant cited in the brief, and it's really out of context because there's no way that you can look at this insurer testimony and come away with anything other than the impression that this transaction is going to substantially increase bargaining leverage and cause the insurer to basically have to pay a price increase because it can't market a network without the combined entity. All that that was talking about is always both sides have some leverage in a negotiation. They have that leverage now, and they'll have that leverage later. What you have to examine in looking at a merger is the change in bargaining leverage, and what's so clear here is how much that's going to change. But in the Hershey area, can you ignore the existence of employer leverage? I mean, Hershey's a pretty tight-knit community. The employers, the hospital, the community itself, all sort of come out of that one spoke, Milton Hershey. And can you totally ignore the employer leverage, the pressure that may be brought to bear on the hospital to be reasonable in their price negotiations? It's not a matter of ignoring it. It's a matter of asking what changes. Whatever leverage the insurers have, they have now. That employer leverage, it exists today. And what the insurers are saying is, is right now, because these entities are separate, it has the ability to negotiate lower rates. But what's going to change? This merger is going to happen, and for geographic market, we have to assume an entity is going to control not just Hershey and Pinnacle, but all these other hospitals in the Harrisburg area. This is a large area. 700,000 people live there, four counties. We're going to control seven hospitals, all the emergency rooms, all the inpatient services in a four-county radius, including a state capital, an MSA, and a surrounding population center. And for us to be right, what has to happen here is that as a result of this increased leverage, the only game in town now goes to the bargaining table and says to an insurer, we want 5% more. What's an insurer going to do? It's absolutely going to pay that. It has no choice or it will not be able to sell its products. All of the local alternatives that it previously had, they're gone. They used to be able to go to different ones, and that's how they send it off. One insurer send it off. Pinnacle's price increased in 2014. They said, we don't need you. We can form a network with just Hershey and another Harrisburg area hospital. What happens with the merger and the hypothetical monopolist? It's gone. All right. Mr. Efron, I see the red light is on, and we'll have you back for rebuttal. Thank you. And we'll hear from Mr. Fischer. No relation on my name. At least I don't think so. He's a court. He was Fischer for the FSU Hershey Medical Center and Pinnacle Health System. Your Honors, there are four main reasons that the government cannot treat the district court's finding of fact as anything other than a weighing of all the evidence that is subject to clear error review. First, the district court engaged in a dynamic rather than a static analysis of patient behavior, and it was properly guided by the hypothetical monopolist test. Second, hospitals can't price discriminate, and that goes to Judge Krause's point earlier. Third, there's no fundamental difference. Counsel, you may want to move that microphone up a little bit. Could you say your second point? Sure. The second point is hospitals can't price discriminate, so they can charge different prices to different patients based on where they live. Third, there is no fundamental difference between the patient perspective and the payer perspective. And fourth, the dispositive question is not what the government has repeatedly argued and what Mr. Efron just said. The dispositive question is not simply whether payers would be better off paying a price increase than not having the hospitals in their networks. So the first point, the district court engaged in a dynamic rather than a static analysis. Let me ask you this. What is the smallest relevant market? I'm not clear from your papers how you would define it. Obviously, they're looking at the four counties. How would you define it? So we don't define it specifically other than it's clearly broader than the four counties, and that's really all we have to do here is show that patients can turn to outside hospitals to defeat a price increase. And it doesn't matter specifically which of those hospitals they are. It's just that the government's market is too narrow. On the question of standard of review, I wonder if you can address our decision in American Motors, because there we said that the district court erred as a matter of law when it misapplied the Supreme Court's test in Tampa Electric because the district court's analysis did not demonstrate a consideration of sufficient factors to constitute the type of economic analysis that was explicated by the Supreme Court in Tampa Electric. In that case, the district court had cited Tampa Electric. It had reported to apply Tampa Electric much like the district court here and cited to and reported to apply a hypothetical monopolist test. Why doesn't our decision in American Motors direct us to treat this as a legal question? And not to complicate things too much, but why isn't that approach reinforced by the Supreme Court's recent decision in Kimball v. Norval Entertainment that seemed to talk about the need to consider for antitrust legal analysis changes in economic theory, suggesting again it's a question of law, not a question of facts, where you have economic theories informing the test that's being applied? First of all, the district court's analysis was perfectly consistent with economic theory, so that's not even really an issue here. In terms of the American Motor case, that was a case where, yes, the court now, whether the products were reasonably interchangeable, but then a factual finding didn't have anything to do with reasonable interchangeability. So you can see why the court there said that the district court hadn't really applied the legal test, even though it had now put a test here. What the district court articulated here is few in, few out. The case it's citing, while the district court itself isn't citing Elzinga-Hogarty, the district court case that it's citing from the District of Illinois does refer to and rely on Elzinga-Hogarty explicitly. You're not arguing that that theory is what should inform the hypothetical market test, are you? No, Your Honor. The thing about Elzinga-Hogarty is that that's a static analysis. That just says if you have a certain number of patients going in or going out, that's the end of your market analysis. And the criticisms of that test have all been uniform. They've said you need to go further. You need to engage in a dynamic analysis and look at actually what patients reasonably would do, and that's exactly what the district court did here. It said patients reasonably would turn to outside hospitals, so it engaged in exactly the dynamic analysis that is missing from Elzinga-Hogarty, and actually in the Illinois case as well. And in a lot of these older cases, the courts actually recognized it was the government that came in and said, oh, just rely on Elzinga-Hogarty, and the courts actually recognized in those cases, no, Elzinga-Hogarty is just a starting point. You have to engage in the dynamic analysis, and in those cases, the government hadn't engaged in the dynamic analysis, and that's why their market was rejected. Here, the district court was very clear. It didn't just stop. It didn't say, you know, there's a number of patients who come into this market and we're done. It said, can patients reasonably turn to outside hospitals, which is exactly the test. And this goes back to your original question. That factual finding matches up perfectly with the legal test that this court has set forth. Why is your adversary wrong in focusing on payer analysis? Because they're not wrong in focusing on payer analysis. It's just that payer and patient analysis, they're not fundamentally different. So everyone recognizes that hospitals to sell their services generally have to do two things. They have to negotiate with payers to set rates and be in the payers' networks, and then they have to actually attract patients to come to their hospitals. Why wasn't the following up on that question, why wasn't the district court wrong in not addressing the role of the payers at all in its opinion? Because there's no difference between saying patients would reasonably turn to outside hospitals and, therefore, outside hospitals discipline the hypothetical monopolist. There's no difference between saying that and saying payers would reasonably turn to outside hospitals, and, therefore, they're disciplined. And it seems to me in a case like this where we have to ascertain whether or not the government's shown the geographic market, that we have to look at the commercial complexities of the product market. And, certainly, one of the major commercial complexities of this product market is the impact that the merger will have on the payers. I guess my question to you is, without regard to the question of whether the geographic market's been established, my question to you is, wasn't it air for the district court not to address the role of the payers at all? No, because there's no difference between saying you're looking at patients. No difference at all. Now, if I could read you a quote, Your Honor, from actually one of the recent cases that the government relies on, which is the ProMedica merger in Ohio. Okay. This was a case in which it was actually the hospitals arguing, and I'm quoting now from the Fifth Circuit's opinion, that MCOs, and those are payers, the argument was that MCOs, payers, rather than patients, are the relevant consumers here, and that, therefore, it was error to assess the substitutability of hospitals from a patient's perspective. The Sixth Circuit rejected that. It said, but this is an argument about semantics. MCOs assemble networks based primarily upon patients' preferences, not their own, and thus the extent to which an MCO regards ProMedica and St. Luke's as closed substitutes depends upon the extent to which the MCO's members do. But isn't the critical question for us, I mean, certainly patient preference is informing decisions of payers, but what are the factors that patients consider? Because what we can take from the government's brief and from the amicus brief that was submitted by the economists here, is that the question of the price hike, the increase in price, is filtered. That's not felt by the patients. So while patient preference is relevant, isn't the issue that since they're not feeling price, it's other factors, and in particular, location and convenience, that end up informing that preference? So two answers to that, Your Honor. First of all, you can't just assume that patients are not price sensitive just because the government cites a factual finding by the Ninth Circuit in an Idaho case involving primary care physicians. That's a factual issue. That's exactly the sort of commercial reality that has to be decided on the facts of each case. And in this case, there is evidence. There's a lot of evidence from payers saying that patients are becoming increasingly price sensitive. There are price transparency tools that payers have put out there to let patients go online and look at the differences that different providers will, the difference in cost to them, and they see patients using those more. There are high deductible plans, health savings accounts, co-insurance. You pay a percentage of your hospital charges. And there are narrow networks and tiered networks. So this is a factual issue, and it's very significant that this is just something that the government wants to assume in this case. The second part of the answer to your question, Your Honor, is exactly what you were asking the other side. When payers and hospitals are bargaining, you can't just say, well, payers would be willing to pay more rather than losing these hospitals from the network. Because guess what? Hospitals would be willing to give up a price increase if the only alternative to them was losing these huge payers, losing all these enrollees. And so the outcome of bargaining depends on, even if neither side really is going to walk away, the outcome of bargaining depends on how much each side would lose if they didn't reach an agreement. And that's where the patients come in, Your Honor. How much do I have to lose if I didn't have an agreement with these payers and my hospital is no longer a network? How much I have to lose depends on patients would not come to my hospital if they were not in the network. Let's come back to the question of critical loss. So the first part of your answer in response you were giving previously to my colleague, what do we do with the fact that the district court here, as to significant evidence in the record, as to both patients and payors, doesn't seem to have acknowledged or grappled with some of the statistics that were put forward. For example, if we're focused on patients, that over 90% of the patients have the preference and are making choices based on location or convenience. Or that when we're looking from the side of the payors, as your adversary has pointed out, that we have both Payor A and Payor B stating that they, in essence, wouldn't have a network, that it was not a meaningful choice to exclude a combined entity here. In light of that, as well as what has been termed sort of naturalistic examples involving Payor E, don't we have a fundamental problem in that the district court doesn't reference those parts of the record or grapple with those facts that have been put forward? No, Your Honor. I mean, first of all, the courts were viewing the district court's finding, and the district court wasn't required to discuss everything that was in the record or all the arguments. Really, ultimately, what matters is whether there's a credible basis in the record for the district court's finding. And ultimately, the district court laid out the most important fact that the government, which had the burden, didn't overcome, which is you have all these hospitals, all these patients from outside, and that meant that patients could turn to outside hospitals. How do we generalize from the fact that patients are coming in to a prestigious academic institution? How do you generalize from that that patients would be equally likely to go outside of that area to other hospitals? You don't have to generalize, Your Honor, because the district court didn't, and we didn't have the burden to say that the patients inside overcome the patients outside. It was the government's burden, and the government really tried to avoid this issue entirely, going back to your question, trying to say, well, all that matters here is whether payers would be better off paying the increase and not having hospitals in their networks. They were just asking the wrong question, and so they never had anything to overcome this issue to grapple with those patients outside. So what was the right question? The right question was the one that the district court asked and answered, which is whether patients reasonably could turn to outside hospitals. And I just want to go through a few things. I mean, the government's main argument in response to that question was, you know, it's inherently local. These hospital services are inherently local. That's where those patients outside, the statistics support that. The statistics for the region that's defined as the Harrisburg area show that it's primarily local. They look for local hospitals. For the patients that live inside the Harrisburg area, the statistics are much better for the government than for the patients who live outside of the area, yes, but that's, again, where hospitals can't price discriminate, so you have to take them all into account. That requires you to argue the Alzheimer-Hodgkin test, that we have to look at the inflow of patients into the relevant market. No, Your Honor, you don't have to look at the Alzheimer-Hodgkin test, because, again, if you were looking at the Alzheimer-Hodgkin test, all you would do is say because there are these number of patients coming in, you're done, that's the end of the story. What the district court did was looked at those numbers and looked at the fact that those patients were traveling a long distance. Those patients, patients from outside of the four-county market. Right. Okay. Right. What does the fact that they're traveling in have to do with the question as to what the geographic market is for determining whether or not this merger is anti-competitive? Because those patients travel long distances and they actually live closer, many of them live closer to outside hospitals. So those patients, half of Hershey's patients, thousands of clinical patients, they're not going to be deterred from going to outside hospitals by this inherently local theory. The government's theory just doesn't work for those patients, and that's a huge segment of this market, and they never overcame that. But isn't the focus those patients that are within the four-county area? No, it's absolutely not. At least they said patients are relevant rather than payors. I mean the question you're arguing, you know, that 46 percent, let's look at that 46 percent for a second, let's assume they all came from the north and they were all members of the Geisinger health plan. Okay. They had nothing to do. They weren't part of the payor A or payor B's plan. They were part of the Geisinger plan. But here what you're saying, here what the government's arguing is that the merger of this is going to have a significant, it's going to result in a snip because you're going to have a hypothetical monopolist who's going to be able to operate within that four-county area and deter and force payors A and payor B to accept their higher prices. It seems to me you're addressing a separate question, not the question for the court here. No, I don't think that's right. I mean there's two issues. Tell me why it isn't right. Sure. One is they ignore the profitability point, okay, and this goes back to critical loss. I mean these are big payors. Even if they could come in and force a price on them, which is not the way this works, the question is would it be profitable? And given the price sensitivity evidence, which they did not overcome, tried to just start a finding from the Ninth Circuit, given price sensitivity, they never showed that the profitability of that price increase would not be defeated by patients substituting outside. Second, on the issue of whether hospitals, I'm sorry, whether payors would actually accept this price increase, that has to do with the relative bargaining leverage of the parties, and the payors have a lot of bargaining leverage here. They put in evidence that as it applies to the payors in this hypothetical, it wouldn't work, that there would essentially be nowhere else to go. And that's where they really misstated the evidence, and even more dramatically as we've gone through this appeal. So the issue is they've come in and they've put on a lot of evidence that, yes, it would be difficult to market a plan in this specific area if you didn't have any of these hospitals. But what they didn't do, what they tried to do in other cases, but what they didn't do here is show that even now it wouldn't be difficult to lose these hospitals, and actually the payors testified quite cruelly on this because Hershey and Pinnacle are so different. Each of them is very important or critical to these networks today. So everything they're saying about how hard it would be to market without a hypothetical monopolist, they haven't shown that that's really significantly different than the situation today. They're saying how hard it would be to market without Hershey or how hard it would be to market without Pinnacle. What do we do with the fact, and this is from this portion of the unsealed record, but we do have statements from PRA and PRB, for example, that for all intents and purposes, there would be no network without the combined Hershey-Pinnacle, that they wouldn't have a whole lot of choice, that they'd probably lose 50% of membership in Domefac County, that the concerns were too much leverage, and they would not be able to negotiate appropriate market pricing and terms. Those things are, and much more, are in the record. Why doesn't that satisfy the government's burden? Because that evidence is part of the entire body of evidence that the court was looking at here,  and it's that entire record that you would have to look at and say there's no credible evidentiary basis for what the district court did. And I'd really like to talk about this payer evidence for a little bit, because the most striking thing about this payer evidence, not live testimony. Unlike every other case, they did not bring these payers in to say this and to talk to the judge live. And the reason why, it's clear, they want to take these snippets that you read and pulled out of their brief, Yvonne, and say, oh, this looks good for us, that looks good for us. Well, there's plenty of other evidence that is very helpful to our case. These same payers are the ones who testify that these hospitals are very different. We need them today. Things are not going to change. Patients are price sensitive. They're not concerned about prices going up. They're not here saying they oppose the merger. So there's plenty of payer evidence that's helpful for us too. And even if it wasn't, Your Honor, even if the payer evidence helped them, there are lots of cases saying that you have to be careful about just having a payer come in and say, this is what I would do, I would accept a price increase. Actually, Professors Arita and Hovenkamp, and this was cited in a case out of California. They quote this. The site is 247 FRD and the jump site is 127. They say, as stated by Professors Arita and Hovenkamp, the least reliable evidence in predicting the effects of a hypothetical price increase is subjective testimony by customers that they would or would not defect in response to a given price increase. Though not irrelevant, such statements are often unreliable, especially when the question is oversimplified. And that last part is very important here too because they've oversimplified the question. Would you, if it were take it or leave it, would you be better off paying a SNP or not having hospitals in your network? Well, that question is much too easy because you could say the same thing now. Right now they would be better off paying a SNP than losing Hershey. They would be better off paying a SNP right now than losing Pinnacle. And the hospitals would be better off giving up a SNP rather than losing these payers from their networks. The payers have bargaining power too. So they tried to completely oversimplify the question and try to rely on these payers in a way that Professors Arita and Hovenkamp specifically warned was unreliable. And so this evidence, you have the payer testimony, you have the evidence about where the patients are going, the 91% inside, the 43% outside. You've got the evidence about growing price sensitivity of patients. You have evidence that the ordinary course documents of the hospitals, of their competitors, and of the payers recognizing that the hospitals in the market compete with hospitals outside the market. They list these hospitals outside the market as their competitors. And there's evidence that the competition from the hospitals outside the market is increasing as well. You have in Lancaster, the largest hospitals now become part of the University of Pennsylvania. They're going in and they're trying to take patients from these Harrisburg area hospitals, trying to fight with them for patients in Lebanon. They opened an outpatient center in Lebanon so they could be a portal for patients down to Lancaster. That will also help them pull patients to the University of Pennsylvania, and that's not the only example. It seems to me that you're making an extraordinary efficiencies argument as opposed to talking about the geographic market. No, Your Honor. Everything I'm talking about shows that outside hospitals are competing with the hospitals in the alleged market. That's the question here. In the face of that are the overwhelming statistics in the 90% range that the people in the foremarket area are going to look for a local hospital for general acute care. And that statistic isn't enough. That statistic, Your Honor, is one half of the Elzinga-Hogarty test. Few patients out. If they complain about this terrible Elzinga-Hogarty test, all you do is look at a statistic. Where do patients go today? Few patients out. Nine percent of patients out. That's exactly what they're saying. And that's the Elzinga-Hogarty test that they say we can't apply. But if this record didn't apply that, it took the number, as I said, the statistic, and it said those patients reasonably could turn to outside hospitals. When patients reasonably can turn to outside hospitals, the outside hospitals are disciplining the prices of the inside hospitals. Mr. Fisher, let me ask you this. If we conclude that the district court clearly erred by not analyzing the impact on the commercial payers, where are you? Where is this case? Is it before us? Did we send it back to the district court? Yeah. What is your argument as to what we should do? If that's our conclusion, I'm not asking you to agree with that, but I'm thinking that's a little hypothetical. That's tough for me, Your Honor, because I know it's tough for you. Give us your best answer. It has to be the factual finding that's clear. It can't be that engaging in a particular analysis is clear error. This court would have used a factual finding for clear error. It would have used a legal determination or an application of law to know about. So if the point is that the court's going to remand, no, I didn't say that. I said if we concluded that there was clear error. So I think, as I understand your question, Your Honor, if you feel that the district court didn't engage in a proper analytical method, I think the question is this court should certainly engage in, if it thinks that a particular analytical method is clearly correct, this court should certainly engage in that analytical method and decide whether engaging that analytical method, it can determine that the factual finding was clearly erroneous. I think that's what this court would do. Going back another way, do you dispute the HHI numbers? That is, if we assume a four-county geographic market, do you agree that it's presumptively anti-competitive given the HHI numbers? Yes, Your Honor, but we, of course, would have an opportunity to rebut that, and actually the district court entered findings that said we've presented ample evidence that this wouldn't be anti-competitive. We've shown that the capacity, the benefits of relieving the capacity constraints, the immediate and very substantial benefits for patients as well as the downward pricing pressure that that would cause, the district court pointed to this increasing competition from outside hospitals as something that will constrain prices. The rate agreements are certainly relevant to the competitive effects analysis you have for at least five years. Seventy-five to 80 percent of the market can't possibly have a price increase. And then even beyond that, you have, again, the other hospitals coming in and competing more heavily. You have the district court's finding that with the merger, the hospitals would be better positioned to engage in risk-based contracting, which everyone agrees is a win-win for hospitals, payers, and patients. So the district court, if you really look at its findings, I mean, it didn't have to go beyond geographic market, but its findings are pretty clear that there are plenty of reasons to deny this injunction even beyond the geographic market analysis. The extraordinary efficiencies test, legally speaking, can overcome any anti-competitive merger. Yes, Your Honor, and I don't think it even has to be extraordinary if, given what we've shown in terms of, without even looking at efficiencies, why this would not be anti-competitive. And a big reason that I didn't mention is what I was talking about before, about the differences between the hospitals, how they're complementary. They're not really competing today. The payers said, we don't play them off against each other in bargaining. We need them both. That's extremely powerful evidence that their market shares don't really reflect the bargaining leverage  And so given all that evidence, even without any efficiencies, actually we think that we have overcome the presumption that would exist there. When we're talking about balancing of the equities, are we talking about balancing of the equities with regard to the injunction or the merger? So I think that everything that I've been talking about would go on the likelihood of success piece to say that we could overcome a presumption and they wouldn't have a likelihood of success. A lot of those same benefits are also going to the equities because, like, the benefits for patients relieving the capacity constraints, those are benefits that this injunction would deny to the public because there's no dispute that if this injunction, if the injunction's granted, that that will kill the merger and the patients are not going to get these benefits. So it works for both. Well, what's the support for what you seem to be ascribing is it's almost double counting, that these pro-competitive effects are things that would be considered as part of likelihood of success for rebuttal purposes and also considered in a traditional equities analysis? I think so, Your Honor, because what you're looking at with the equities analysis, I think, is what's the harm of granting the injunction if it turns out to be that it was a wrong decision? And so it's a little bit different analysis from the likelihood of success where you're saying, you know, there are good things that are going to happen in this merger as well, and those good things are we're going to lose those if we grant this injunction because it's going to kill the merger. Okay. I have a question. The district court, as you were explaining, identified certain pro-competitive efficiencies, including in particular the capacity constraints repositioning and risk-based contracting. Are there any other pro-competitive efficiencies that you think are reflected in the record that the district court did not identify? There were efficiencies beyond the relief of the capacity constraints. This is some of the standard efficiencies you have with a merger. We can be more efficient in focusing certain services at one hospital versus another. We can bring these hospitals together and combine them. So there was evidence of those efficiencies. It's not really an efficiency, but I would say the most important factor here that the district court didn't address because it didn't need to was this point about the difference between the hospitals. I mean, the district court in its descriptions of the hospitals clearly recognized this, but it didn't really specifically talk about how the differences between the hospitals mean, and the payers testified to this, they're both needed in networks today. So they're not really competing against each other. They're not being pitted against each other. So that's not something that you can do now that you're going to lose if you have a merger. And on the question of profitability and the critical loss analysis that you referenced earlier, in your view, who has the burden of proof as to the question of critical loss? The government has the burden of proof for everything here. In terms of if your honest question is the burden of proof with respect to showing what the critical loss number is, I don't think that's a severable issue that you sort of have to decide you have to enter a separate factual finding on. But they're abandoning the critical loss at all. They're not taking that into account whatsoever. But they don't really dispute the 7% number. I just want to clarify here. When they say we didn't calculate critical loss, we didn't do some mathematical analysis that said, you know, you're going to lose 8% of your patients or you're going to lose 9% of your patients if you impose a SNP. As I think one of Judge Greenaway's actually district court decisions noted, this type of analysis typically isn't done with mathematical certainty. Basically, you're looking to really where the field of real competition is. But the point about the 7%, which is undisputed, is that's a way to kind of frame the evidence and look at the numbers about what they're talking about here. And that shows that if patients would be reasonably able to turn to outside hospitals, either because they're price sensitive and they would leave when the hospitals are in that work, or it also shows how many patients the hospitals would lose if they don't reach an agreement and the hospital goes out of network. The 7% number really frames that and shows that hospitals have a lot to lose if they lose patients. Okay, thank you. Thank you, Your Honor. We'll have Mr. Eckhoff back on revolve. Thank you, Your Honor. I want to address, the first point I want to address is that even if you were to accept this Hershey critical loss argument, and we obviously vigorously dispute that and have explained why, but even if you were to accept that, it in no way accounts for one of the three fundamental errors that the judge made here, which was to never examine whether prices could be raised at Pinnacle. Their entire theory is based on this percentage of patients that come out of the area from Hershey that if somehow their prices were increased, these patients would go to hospitals closer to home. None of it applies to Pinnacle because Pinnacle overwhelmingly draws its patients from within the Harrisburg area. So even if you were to accept that, we've still shown that the hypothetical monopolist test here is satisfied because prices clearly could be raised at Pinnacle. And that error is particularly glaring here because of how strong the evidence is that this is exactly what the insurers were concerned about. The CEO of Hershey said payers had a lot of anxiety about Pinnacle's prices being raised to Hershey. One of the two large insurers calculated this and said we think this is likely. This is specifically what the two insurers sought protection from in signing these rate protection agreements to keep part of that. So to not ask that essential inquiry here is also error because if you had, it's clear that the test was met. I realize you make that argument and we do have this language in the guidelines about the SNP being imposed from at least one location. But how do we square that with the paradigm of the hypothetical monopolist test, which seems to assume that you have a single system? So that unwinding that again for purposes of the analysis and looking at individual locations, that doesn't really seem to square with the idea of the monopolist. Well, let's take it in its most basic form. You're looking for whether prices ultimately are going to go up and you're also looking within this candidate market whether there's some force that constrains prices or whether the alternatives are actually outside of the area. So in the face of this price increase, what is the buyer going to do? Can it resist that price increase by turning to hospitals outside the area? Here can insurers market a network without that? Now in this case, compelling evidence, 2014, Pinnacle seeks substantial price increases with one of the large insurers. What constrained that? The insurer specifically said it was its ability to say, we can exclude Pinnacle from the network and form a network with Hershey and another Harrisburg area hospital. It's exactly that constraint which goes away when you either form the merger or the hypothetical monopolist. So the whole point of this exercise is to understand whether bargaining leverage is going to increase and there's a price-constraining force that's going to be removed. And you just look right at that and it's clear, the testimony is clear that that separate existence of Hershey benefited the payers in terms of lower prices and that's exactly what would be gone from the transaction. So to not ask that in connection with either geographic market or, again, it answers the ultimate inquiry here whether the prices are going to go up as a result of this merger. Well, we have a great agreement here, if we can go back to that for a second, because we are asked as part of this test to take account of the commercial realities. One of the commercial realities here happens to be that the two largest payers, the prices are locked in for a significant period of time. Is it the government's position that private agreements are never relevant? That is, if we had an agreement that was for 25 years, not five years, in a rapidly changing market, would it still be irrelevant? They are irrelevant to determining geographic market and this court has said and other courts have also said and Queen City Pizza v. Domino says no court's ever done it. Not only has this court not ever relied on private agreements and market definition, but it couldn't find any other court that did. To the extent your question is could you factor into a competitive effects analysis, well, you could. We obviously think that it's totally insufficient even there because it's temporary, limited in duration, doesn't apply to all payers, doesn't ameliorate the fundamental thing here, which is this loss of competition that's going to be felt long after those rate agreements expire. I mean, even one of the large insurers said when this rate agreement expires five years from now, it didn't think it had the leverage to fend off a price increase, so that's what it thinks is going to happen five years from now. But in geographic market, yes, it has no place. It's irrelevant because it totally prevents you from getting to the question of what alternatives do insurers actually have or what alternatives do any buyer actually has. It distorts the entire inquiry. Let me ask you this. If we've heard and a merger goes through, the administrative trial begins, goes through its course, and comes to a different conclusion, merger's illegal, et cetera, tell me the practical considerations we should think about with regard to the merger being unwound at some point. Obviously, the case law says, look, it's very difficult, if not impossible, to unscramble the egg. Once you merge these people, let's say that happened today, immediately they would share competitively sensitive information. They would lay off people. They would combine themselves. The FCC has had some very unfortunate experiences trying to unwind transactions. It's extremely difficult to do. Whereas, on the other hand, if you grant it, if you reverse, if these are real benefits that they're claiming are there, they can enjoy those benefits after there's a full trial on the merits. They can still do those things if they're actually real benefits of the transaction. But we could not unscramble the egg here once this is done. If we accept your position that the Seventh Circuit affirms and advocates health care, are we creating a circuit split? No, I don't think so, Your Honor. First of all, I mean, there's already cases, different circuits, which view this differently. I mean, we have the Ninth Circuit in St. Luke's, more recent circuit court cases, looking at things through the hospital insurer lens, St. Luke's and ProMedica. You have the older cases, which are cited from the Eighth Circuit. So, in that sense, there's disagreement. But it's really not. I mean, there was a failure to properly apply a hypothetical monopolist test, but I don't know that it's actually a split for that reason. And talking about circuits, you have the Eighth Circuit test, which was articulated in the Tennant case. You have the Ninth Circuit test, which was later articulated in the St. Alphonsius case. Why was it clear for the district court to adopt the Tennant test as opposed to the Ninth Circuit test? Because the effectively applied Algina-Hogarty one, it held that we didn't meet our, we didn't establish our... Well, you talk about the Algina-Hogarty test, but, you know, has any court ever said that that test should not be applied in hospital mergers? I don't think a court specifically repudiated it. I mean, you've argued against it. Well, the Supreme Court says that you've got to, when economics change, antitrust laws change. And this is, I mean, we've submitted, the 37 of the leading health care economists in the world, including the inventor of the test himself, has submitted. I don't believe a court has specifically said no Algina-Hogarty, but I believe the recent cases show that you really do have to look at this through the hospital insurer lens. But it has thoroughly been discredited even by its own inventor in the health care context. And it's important to note, too, that it leads to exactly the clearly wrong result that the judge got to here. Because let's take a look at his market for a second. Defendants have said, well, Algina-Hogarty, it's really just static and it's not dynamic. This is a classic EH mistake because what it does is it leads to overly broad markets and it masks local market power and it masks transactions that actually cause harm. And the reason for that is, let's take a look at the judge's market. We have evidence that said if you just exclude Hershey and Pickle, you can't market them that way, right? The judge says, okay, well, you get to own Hershey, you get to own 18 hospitals. You get all of the hospitals in York County, all of the hospitals in Lancaster County, all of the hospitals in the Harrisburg area, and you keep going and you own 18 hospitals. You're basically a monopolist in south-central Pennsylvania, but you don't have market power to impose this 5% price increase because you don't own the 19th hospital 65 minutes away. I mean, this is the classic mistake. This is why this is clearly wrong when you just look at just what patients do without filtering it through the hospital and chore lens. It's just the wrong question and the wrong answer. Well, we have, as the rebuttal point for likelihood of success and on equity, is some confusion in the district court's opinion about where, in which category it was considering those efficiencies. And apparent failure, if it was the rebuttal point, to apply the usual rigor and test that's applied there. Why shouldn't we remand if we reach the point of there being a rebuttable presumption for the district court to apply that rigorous analysis and to more clearly articulate what it's doing as to the pro-competitive efficiencies rebuttal point versus the equities? Because on the record below, there is simply no way that defendants could have met that extraordinary burden that they would have had had the court properly ruled on geographic market. This transaction should have been declared presumptively unlawful. At that point, yes, the burden would shift. Yes, they'd have to show clearly no uncompetitive effects or extraordinary efficiencies, which there's no way they could have done. All doubts are to be resolved against this transaction. I mean, that's even what the case law says, Elder's Grain. Their largest purported efficiency is actually a harm on its face. It doesn't even benefit consumers. Consumers are worse off. The ProMedica District Court says that because it's a competition-driven investment that's going to be canceled. There would be more competition if Hershey built that bed tower. And they never even verified that they need that amount of beds. They never showed it was merger-specific on its face. There's no way they could have substantiated that enormous need. And similarly, with repositioning, they have to clearly show there are no anti-competitive effects. I mean, on their face, the judge credited repositioning that had already occurred. The insurer said clearly that wasn't enough to restrain them from having to pay a price increase. So they know about all these competitive developments in the marketplace. And they said, well, yeah, we still couldn't exclude Hershey & Pinnacle. The judge could never on the record below have established that they met this extraordinary burden. Do you agree with Mr. Fisher on pro-competitive efficiencies, that those are something that a court, whether a district court or our court, can take account of both as to the rebuttal point and within equities? Well, I don't think they're equities at all. I think the judge miscast these purported efficiencies and defendants' other defenses under the guise of equities once it had found geographic market dispositive and it had this discussion of these other things, which are otherwise defenses defendants would have had where they would have had the burden. And obviously we dispute that they're benefits at all. So I don't think they can be certainly credited as any kind of equity that would justify this merger. Okay. All right. We thank both counsel for excellent arguments in this case and for a good job on your briefs. And we'll take this matter under advisement. Thank you, Your Honor.